IN THE MATTER OF ARBITRATION )
)
)
MONONGALIA COUNTY COAL CO. )
)
and ) Case 16-31-18-064
)
)
UNITED MINE WORKERS OF AMERICA, )
DISTRICT 31, LOCAL UNION 1702 )

Appearing for the Employer:
    Brady West, Employee Relations Coordinator
    Roland Smith, Preparation Plant Superintendent
    Scott Boylen, General Manager
    Jim Travelstead, Supervisor Human Resources
    Robert Klatt, Observer

Appearing for the Union:
    Michael Phillippi, UMWA District 31 Field Representative
    Mike Connors, UMWA Local 1702 Mine Committee
    Ryan Lemley, UMWA Local 1702 Mine Committee
    Shawn Sampson, UMWA Local 1702 Mine Committee
    Zyndall Barr, Grievant
    Jim Dawson, Grievant
    John Dixon, Grievant
    Matt Dixon, Grievant
    Tom Garrett, Grievant
    Mark Kuhn, Grievant
    Dave Lawson, Grievant
    Jim Martin, Grievant
    John Mitchell, Grievant
    Ben Plum, Grievant
    John Rush, Grievant
    Jesse Ryan, Grievant
    Steve Shaffer, Grievant
    Doug Stalnaker, Grievant
    Mark Stickles, Grievant
    D.J. Weaver, Grievant
    Larry Whipkey, Grievant
    Rocky Barr, UMWA Local 1702
    Jim Ponceroff, UMWA Local 1702

Before Matthew M. Franckiewicz, Arbitrator

## OPINION AND AWARD

This arbitration proceeding involves contracting out of work on the 75 Screen at the Preparation Plant.

A hearing was held on May 17, 2018 at Fairmont, West Virginia. Both Parties called, examined and cross examined witnesses, and offered documentary evidence. Both Parties provided oral arguments at the conclusion of the hearing.

EXHIBIT A

## Contract Provisions Cited by the Parties

ARTICLE I – ENABLING CLAUSE

THIS AGREEMENT, made this 15th day of August, 2016 between the coal operators and associations signatory hereto, as parties of the first part (each coal operator which is a signatory hereto being called "Employer") and the International Union, United Mine Workers of America (hereinafter called "Union"), on behalf of each member thereof, as party of the second part, covers all of the bituminous coal mines described in Article 1A, Section (f), owned or operated by said first parties. This Agreement carries forward and preserves the terms and conditions of all the various District agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.

This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the parties of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining to management. The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

Article IA – SCOPE AND COVERAGE

Section (a) Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads,

and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

Section (d) Management of the Mines

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

Section (g) Contracting and Subcontracting

\* \* \*

(2) Repair and Maintenance Work--Repair and maintenance work of the type customarily performed by classified Employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, in which case, upon written request on a job-by-job basis, the Employer will provide to the Chairman of the Mine Committee a copy of the applicable warranty or, if such copy is not reasonably available, written evidence from a manufacturer or a supplier that the work is being performed pursuant to warranty; or (b) where the Employer does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop) with necessary skills available to perform the work at the mine or central shop.

\* \* \*

Section (i) Construction Work

All construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the Employer normally performing construction work in or about the mine in accordance with prior practice and custom, shall not be contracted out at any time unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules.

Provided further that where contracting out of such construction work customarily performed by classified Employees at the mine is permitted under this Agreement, such contracting shall be in accordance with prior practice and custom. Where contracting out is permitted under this section, prior practice and custom shall not be construed to limit the Employer's choice of contractors.

Article XXIII – SETTLEMENT OF DISPUTES

Section (h) Finality of Decision or Settlement

Settlements reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement.  Settlements reached at steps 2 and 3 shall be in writing and signed by appropriate representatives of the Union and the Employer.

Section (k) Prior Agreement

Any dispute and/or difference which as of the Effective Date of this Agreement is in the process of adjustment under the Settlement of Disputes section of the prior Agreement or any dispute and/or difference presented on or after the Effective Date of this Agreement which is based on the occurrence or nonoccurrence of an event which arose prior to the effective date of this Agreement shall be processed under the procedural provisions of this Agreement and shall be resolved under the applicable provisions of the prior Agreement. Decisions reached under this provision shall be final and binding. All decisions of the Arbitration Review Board rendered prior to the expiration of the National Bituminous Coal Wage Agreement of 1978 shall continue to have precedential effect under this Agreement to the extent that the basis for such decisions have not been modified by subsequent changes in this Agreement.

### Article XXVI – DISTRICT AGREEMENTS

Section (b)  Prior Practice and Custom

This Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished. Except where abolished by mutual agreement of the parties, including the provisions of Article II G.10 of this Agreement, all prior practice and custom not in conflict with this Agreement shall be continued, but any provisions in any District or local agreements providing for the levying, assessing or collection of fines or providing for "no-strike," "indemnity," or "guarantee" clauses or provisions are hereby expressly repealed and shall not be applicable during the term of this Agreement. Whenever a conflict arises between this Agreement and any District or local agreement, this Agreement shall prevail.

Within six (6) months following the Effective Date of this Agreement, the Employers and all the UMWA International District Vice Presidents shall provide to the International Union and the BCOA, copies of all District agreements in their possession. All District agreements which are not provided to the International Union and BCOA during the first six (6) months of this Agreement may not be relied upon by any Employer or the Union in any grievance proceeding which may occur during the balance of this Agreement.

## Background

Three grievances, filed on behalf of multiple Grievants, protest the use of a contractor to replace components on the 75 Screen at the Preparation Plant for the Monongalia County Mine (formerly called the Blacksville No. 2 Mine) on four days: Monday February 12, Thursday February 15, Friday February 16 and Saturday February 17, 2018.

The Screen transports and sorts coal by size. Smaller pieces and particles fall through holes in the screen as the coal is being moved and shaken. As is evident from photographs in evidence, the Screen itself is a large apparatus, and consists of a number of components, among them decks, side plates, spreader bars, cross bars, shaker panels, mechanisms, mechanism beams, back plates, feeder (feed box) and chute.

Various components wear out at different rates and are replaced as the need arises. In some cases replacing a part requires some or all of the other components in the vicinity to be removed in order to get to the specific part to be replaced. It is fair to say that at least some of the components need to be replaced every year, and that hardly a month passes without at least some part being replaced. The longwall is moved every 9 months or so and while this is in progress, the Preparation Plant is down. Typically this period is used to replace multiple components on the Screen.

There is no dispute that the Grievants had the skills to perform the work that was carried out by the contractor in February 2018. Union witnesses testified that they had repaired or replaced every component of this or other screens, and that at one time or another they had done everything that the contractor's employees did in February 2018. Union witness Rocky Barr, who is not a Grievant, testified that he has been involved in complete rebuilds of screens "down to a hole in the ground" 6 or 7 times, and that at one time or another he has changed "every bolt and nut" on the Screen.

The Company characterizes the work involved as "the complete removal and rebuild of the 75 Screen." There was testimony that such a rebuild takes place roughly every 7 or 8 years. While the majority of the components of the 75 Screen were replaced by the contractor in February 2018, photographic evidence and testimony indicate that not all the components were replaced. For example, existing mechanisms, mechanism beams, pedestals and cross bars were reused.

Preparation Plant Superintendent Roland Smith testified that the work at issue was performed during a time when the longwall was being moved, and the Prep Plant was not in normal operation. Apparently such "idle" periods are quite busy, with multiple tasks being accomplished while the Prep Plant is down. Smith recalled that during this time frame, Classified Employees were rebuilding a washer.

For the most part, although there were some variations, the Grievants worked 8 hours on February 12, February 15 and February 16, but did not work of Saturday February 17. Notices were posted that overtime was available, and the Grievants could have worked on February 17 if they had volunteered to do so. The Grievants who testified were not requested to come in early or work over on any of the dates involved, and to the best of their knowledge none of the Grievants was mandated to work overtime on any of these dates.

The Company offered invoices (Employer Exhibits F - H) showing that contractors had replaced components for Screens (although not necessarily the 75 Screen) on December 29, 2013, September 20, 2014, August 2, 2015 and February 17, 2018. All these dates were Saturdays or Sundays.

## Issue

The Union frames the issue as: Did management of the Monongalia County Coal Company violate the terms of the National Bituminous Coal Wage Agreement of 2016 by enlisting the use of contractors to make repairs to the 75 screen, and if so what shall the remedy be.

The Company frames the issue as: Did management violate the contract by utilizing outside contractors to perform work not customarily performed by Monongalia County Mine bargaining unit employees? If so, what is the appropriate remedy?

Under either phrasing of the issue, the outcome in this case is the same.

## Position of the Union

The Union stresses that once an activity is determined to be within the scope of Article IA Section (a), subcontracting is not permitted, with the only exceptions being those specified in Sections (g) and (i) of Article IA. It reads the phrase "of the type" in Article IA as expanding the Union's prior jurisdiction. It relies on Arbitration Review Board Decision No. 78-48 and the subsequent modification of Section (a) to add the words "of the type."

It maintains that Classified Employees are harmed when work is improperly contracted out and that a compensatory remedy is in order.

It emphasizes the notion of availability under the "reasonable availability" test approved by the A R B in Decision No. 78-45. It regards the recent decision by Arbitrator Thomas L. Hewitt between the same Parties as res judicata on the point that the Grievants were available to do the work involved.

It also relies on seven other arbitration awards involving Monongalia County Coal Co., or its predecessor Blacksville #2 Mine. Among these are Case No. 11-31-16-364 (Jacquelin F. Drucker, 2018) with an extensive discussion of "construction" within the meaning of Section (i), and Case No. 11-341-15-092 (Alexander E. Wilson III, 2015), which deals at length with the issue of availability.

The Union further cites ten additional panel arbitrator decisions at other facilities (including some sister mines), which of course do not have binding effect, some of which are discussed further within.

## Position of the Employer

The Company notes the Arbitration Review Board's recognition of Management's inherent prerogatives, including the assignment of work and the direction of the work force. It observes that under A R B Decision No. 78-48, the Union bears the burden of showing as a threshold matter that work is "customarily" performed by the bargaining unit, that one instance is not enough, and that the determination must be made on a local level. It avers that a rebuild of the 75 Screen had not been previously, let alone "normally" or "customarily," performed by anyone, and that it is insufficient that bargaining unit Employees could have performed the work if they had not customarily done so. It contends that if the Union fails to show a custom or practice of Classified Employees normally and customarily performing the work, the case is at an end. It characterizes the work as "rebuilding to like new specifications and tolerances with a new life expectancy." It argues that bargaining unit Employees have not completely rebuilt the 75 Screen previously. It regards a complete rebuild as different from everyday replacement of parts or adjustments.

It relies on a six A R B decisions and 23 panel arbitrator decisions applying these precedents. It maintains that the words "normally" and "customarily" used in Article IA should be given their common meanings as usually and regularly. It insists that it does not suffice that the task is similar in mechanical operations, skills and techniques to that previously performed but on whether work of the type has in fact been performed.

Among the panel arbitrator decisions it cites, the Company relies on a decision at a sister mine involving a complete bucket rebuild, and a decision comparing day-to-day repairs with a complete rebuild of a coal washer. It references additional panel arbitration decisions distinguishing repairs from an "all at once" rebuild.

As to the matter of damages, the Company argues that no Employee suffered any loss and that the Agreement does not provide for punitive damages. It relies in part on A R B No. 78-16 that an arbitration award must be "compensatory only," and A R B No. 78-26 that a loss must be shown with a reasonable degree of certainty, and that the burden of showing such loss is on the Party claiming the loss.

It asks that the grievances be denied.

## Analysis and Conclusions

A threshold question in this case is whether the work on the 75 Screen was "repair and maintenance work normally performed at the mine site or at a central shop of the Employer" or "work of the type customarily related to" such work. If the answer to this threshold question is no, then the Company did not violate the Agreement by contracting out such work, and the inquiry is at an end. If the answer to the threshold question is yes, additional questions must be considered as to whether the contracting out fell within either the "repair and maintenance" exception in Article IA Section (g)(2), or was permissible under the "construction" provision in Article IA Section (i).

In this case the question whether the work done on the 75 Screen by the contractor was within the work jurisdiction of the bargaining unit under Article IA Section (a) turns on whether this was work "normally performed." This is an important phrase and it is essential to give each word its proper meaning. As has often been noted, "performed" connotes that the same work has actually been carried out, and not simply that

members of the bargaining unit have the skills to do the work involved. "Performed" cannot be read to mean "could perform."

The word "normally" has been applied by arbitrators as "usually," "typically" or "most of the time." It is not necessary that Classified Employees have exclusively performed the work at issue in the past; it is sufficient that they have usually done so, even if contractors on occasion have also done the same work.

Before I address the application of the critical phrase "normally performed," I first address another crucial word in the language of Section (a), namely the word "work." As has often been observed, how one defines the relevant "work" is often determinative of the ultimate question of whether that work is within the work jurisdiction of the bargaining unit.

The Employer describes the work at issue as a "complete rebuild" of the 75 Screen. The Union in its opening statement described the work as "the use of contractors to make repairs to the 75 screen."

Component parts of the 75 Screen wear out and consequently need to be replaced. Various components have different lifetimes, and typically need to be replaced at different times. Sometimes it is necessary to remove several components to reach the one that needs to be replaced. In the current instance, the Employer took advantage of idle time when the longwall was being moved to replace parts on a wholesale basis. No doubt some of these components were already in need of replacement while others were not yet worn out but would need to be replaced at some time in the future. But as long as the 75 Screen was largely being disassembled, it made sense to replace these worn but not quite exhausted components then rather than wait until they were completely worn out, which would involve repeating some of the disassembly steps.

While the work done on the 75 Screen in February 2018 was surely more extensive than the typical replacements done on a month to month or year to year basis, I find that the Company's characterization of the February 2018 work as a complete rebuild does not accord with the evidence.

The contractor removed and replaced many of the parts of the Screen, even most of the parts. But it is undisputed that many of the existing components were reinstalled rather than replaced. Among these were mechanisms, mechanism beams, pedestals and cross bars. Thus the overall job could not be characterized as a "replacement" of the 75 Screen, since many of the original components were reused. It is more accurate to describe the "work" at issue as performing repairs, although extensive repairs, on the existing 75 Screen as distinguished from creating a new or different 75 Screen. The work done by the contractor was surely more extensive than the work done by any one Classified Employee at any one time, but this amounts to a difference in extent, rather than a difference in kind, in the work involved.

In Monongalia County Coal Co. and UMWA District 31, Local Union 1702, 11-31-16-364 (2018), Arbitrator Jacquelin F. Drucker quotes from a decision in Pittsburgh & Midway Coal Mining Co. and UMWA District 20, Local 1926, which in turn quotes from Arbitrator Thomas Phelan in a case later identified as Sunnyside Coal Company. The quote attributed to Arbitrator Phelan is that repair and maintenance involves "fixing or servicing existing machinery and equipment, and is done for the purpose of restoring it to proper working order or keeping it in good working order." It seems to me that Arbitrator Phelan's definition is applicable to the current work, and that this work is appropriately characterized as "repair and maintenance work," rather than something else.

In this regard, I note that after the work was completed the 75 Screen was not new or different. The pre-existing 75 Screen was not altered, modified or improved. All the work was performed on an existing system, which (to apply Arbitrator Phelan's test) was being restored to proper working order or being kept in good working order, as distinguished from being replaced by something better. The work did not involve any new design or fabrication. Existing worn parts were being replaced by identical but new parts. It cannot be said, however, that the 75 Screen itself was being replaced by a new 75 Screen.

Because of the idle time opportunity, the Company chose to combine the replacement of a number of components of the Screen, which would otherwise be accomplished by Classified Employees at various times, into a single larger project replacing multiple components at once. This does not, however, alter the

nature of the "work" involved. As Arbitrator Phelan said in Inland Steel Coal Company and UMWA District 12, Local Union No. 2414, 84-12-85-302 (1985), page 12:

> With regard to the first factor, the size of the project here did not really change the nature of the work being performed but only meant that there was more of the same type of work. The size of a project could result in the classified Employees not being available to perform it within a time frame in which it has to be performed, but that consideration goes to the possible applicability of one of the exceptions in Section (g)(2), not to the basic issue of jurisdiction over the work. I do not consider the size of the project here as depriving the classified Employees of jurisdiction over the work because the work itself was still the same type of work which they customarily performed.

The Company relies on several "rebuild" cases, and while these involved different Parties, some were authored by respected Arbitrators and deserve some comment. Of course cases like these turn on the specific facts involved, and I find them to be distinguishable from the current case.

In Freeman United Coal Company and UMWA District 12, Local Union 12, 88-12-92-1604 (Paul L. Selby, Jr., 1993) a complete rebuild was involved. Arbitrator Selby noted (page 14) that Union witnesses conceded that Classified Employees had not performed all the tasks carried out by the contractor. He went on to conclude (page 19):

> Thus, in effect, Bollmeier demolished and removed the existing secondary jig elevator and, in its place, installed an entirely rebuilt structure involving both new support, guide and wear structure, and new operating parts. Although the Grievant employees "repaired" a portion of the wear strip and that involved cutting chains, pulling part of them up, and then reconnecting the chains and reinstalling them, the record shows that this work, concededly and undoubtedly arduous as it is, and requiring substantial skill as it does, that work was temporary repair work and did not constitute the complete rebuild performed by Bollmeier. As many arbitrators have said, including the Bloch Arbitration Review Board, the question is not whether the Grievant employees could do the work; the question is whether they have customarily performed work of the type in such a fashion that the Article IA (g)(2) prohibition applies to make contracting it out a violation of the contractual prohibition.

By contrast the current case involves replacement of many, but not all of the components of the 75 Screen, and not any demolition, and cannot accurately be described as a complete rebuild.

In North River Energy Company and UMWA District 20, Local Union No. 1926, Grievance No. 1926-14-86 (David L. Beckman, 1986) a dryer was removed and sent out to be rebuilt. Arbitrator Beckman analogized the situation to the purchase of a new dryer "The effect on day-to-day maintenance after the dryers are completely rebuilt is not unlike the effect of buying eight new dryers." He concluded (page 12) "The distinction between: (1) repairing dryers, as needed on a day-to-day basis, while the dryers are in-place in the preparation plant and (2) repairing dryers on a long-term basis by removing them, replacing them, and then subjecting them to a complete rebuild job is a reasonable and valid distinction."

As noted above, the present case involves replacement of many of the components of the 75 Screen, but is not a complete rebuild, and the work involved was performed on site rather than elsewhere.

Similarly in Consolidation Coal Company McElroy Mine, 81-6-84-1023 (James E. Rimmel, 1984) a Scoop Car Bucket was sent out to the facility of a contractor, who had equipment including sand blasting, line boring and steel forming equipment, which the Company did not possess. This case is distinguishable on the same basis as North River.

I conclude that the repairs performed by the contractor were and are normally and customarily performed by bargaining unit Employees.

As to whether bargaining unit Employees normally performed the work that the contractor did in February 2018, the record indicates that there was nothing the contractor did in February that Classified Employees had not done previously. The work the contractor performed was not merely similar to what members of the bargaining unit had done, it was the exact same work on the exact same Screen. As one witness put it, members of the bargaining unit had replaced "every bolt and nut" that the contractor did.

Furthermore, the evidence shows that work on the 75 Screen was "normally" performed by Classified Employees. There were a few occasions on which contractors worked on Screens, but on a month-to-month and year-to-year basis, the replacement of worn out components on the Screen was accomplished by Classified Employees.

The Company does not argue that the work at issue was construction work to which Article IA Section (i) would apply. Much of what has already been said would indicate that the work at issue is more appropriately characterized as repair and maintenance work rather than construction work.

Under Article IA Section (g)(2) an Employer may contract out repair and maintenance work in specified circumstances. Neither the warranty nor the lack of equipment exceptions are applicable here, and the question becomes whether there were Employees with the necessary skills "available."

As noted above, for the most part the Grievants worked 8 hours on each of the days that the contractor was working, with the exception of one Saturday, on which most of the Grievants did not work.

In Old Ben Coal Company, A R B No. 78-45 (1980), which involved the repair of transformers and switches, the Board approved the "reasonable availability" test applied by the District Arbitrator, as contrasted with the "full employment" test. The Board explained the test as "That the work would have to have been done on premium time, found the Arbitrator, did not release the Company from the obligation to schedule the men."

The District Arbitrator, whose decision was affirmed, said

> The mere fact that work may be required to be performed on premium time does not of itself establish that regular employees are unavailable to perform it. * * * The Company may mandate certain premium time and even on a seventh day, the employees are obtainable and usable to the extent they are willing to work premium time and do not decline or refuse it under the terms of the contract. * * * Indeed, the Company could have reduced the number of additional premium hours required of the other Electricians by having required Wilcox to work Saturdays.

The Union cites two cases involving the current operation.

In Monongalia County Coal Co. and UMWA District 31, Local No. 1702, 16-31-17-022 (Thomas L. Hewitt, 2018) the Company argued it could contract out repair work because bargaining unit Employees were not reasonably available because of limited physical space to perform a repair. Arbitrator Hewitt disagreed, accepting the Union's argument that Classified Employees should have been called in early and imposed a monetary remedy, saying "A loss was suffered by the Grievants as they lost the opportunity to perform the overtime work and receive pay for that time."

In Monongalia County Coal Co. and UMWA District 31, Local No. 1702, 11-31-15-092 ( Alexander Wilson III, 2015), also involving contracting out, the arbitrator rejected a contention that Classified Employees were unavailable because they were working all the overtime they wanted. (He nonetheless denied a monetary remedy because of a failure on the Union's part to identify who had suffered a loss.)

I read these two cases as requiring a holding that on this property, the fact that the Grievants could have worked voluntary overtime on Saturday does not make them unavailable, in the absence of a more specific request to them. Likewise on weekdays their services were available if the Company chose to call them in. I shall therefore direct a make whole remedy.

To summarize the above, I conclude that the work of repairing the 75 Screen was within the bargaining unit's work jurisdiction under Article IA Section (a), that the work involved was repair and maintenance within the meaning of Section (g)(2), and that the Grievants had the necessary skills to perform that work, and were not unavailable within the meaning of Section (g)(2).

The evidence discloses the number of contractor employees and the number of hours they worked on each day in issue. There are more Grievants than there were contractor employees on any of the days involved. The easiest, but perhaps not the fairest, method for allocating damages would be to award a pro rata share to each of the Grievants. This, however, would ignore individual considerations as to which individuals likely would have worked on particular days, or whether particular Grievants were or were not available on particular days. Accordingly I shall assign to the Parties in the first instance the task of distributing the damages to the Grievants, while retaining jurisdiction against the possibility that they may be unable to agree on a specific calculation.

## Award

The grievances are sustained. The Company shall cease and desist from contracting out repair work on the 75 Screen. It shall also make whole the Grievants in keeping with the above. Jurisdiction is retained for the limited purpose of resolving any disputes that may arise in connection with the implementation of this remedy.

Issued June 1, 2018

*Matthew M Franckiewicz*